# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF OKLAHOMA

KATHERINE RODDEN, )
)
         Plaintiff, )
)
vs. ) Case No. CIV-07-670-M
)
JOHN HANCOCK FINANCIAL )
SERVICES, INC. EMPLOYEE )
WELFARE PLAN, formerly known as )
John Hancock Mutual Life Insurance )
Company Employee Welfare Plan, )
)
         Defendant. )

## ORDER

Before the Court is plaintiff's Opening Brief on the Merits, filed April 14, 2008. On May 14, 2008, defendant filed its response, and on June 13, 2008, plaintiff filed her reply. On July 11, 2008, plaintiff filed a Supplemental Brief in Support of Plaintiff's Motion for Judgment/In Opposition to Defendant's Motion for Judgment, and on July 22, 2008, defendant filed its supplemental response brief. Also before the Court is defendant's Opening Brief Regarding Merits, filed April 14, 2008. On May 5, 2008, plaintiff filed her response, and on June 13, 2008, defendant filed its reply.

## I.    INTRODUCTION

### A.    The Plan

Defendant provided long-term disability insurance benefits to eligible employees of John Hancock Mutual Life Insurance Company ("Employer"). Under Policy No. 1-GCC ("Policy"), employees of the Employer are eligible to receive long-term disability benefits when they are determined disabled as defined by the terms of the Policy. Specifically, the Policy provides, in pertinent part:

"Totally disabled" means:

(1)  In order to determine when you start a continuous period of total disability, and for the first 36 months (60 months for Marketing Representatives and Ford Group Office Clerical employees) of such period, only such incapacity, as determined by the Company, and which is due to a physical or mental impairment which keeps you from doing all the essential duties of your occupation; and

(2)  after the first 36 months (60 months for Marketing Representatives and Ford Group Office Clerical employees) period and for the rest of such continuous period of total disability, such incapacity which is due to a physical or mental impairment, which keeps you from doing the essential duties of any occupation or employment for which you are qualified by education, training or experience.

Administrative Record at CL-00876.[1]  The Policy further includes "Reasonable Continuity and Reasonable Earnings Guidelines," which provide, in pertinent part:

> When making an "own occupation" or an "any occupation" determination, the decision <u>must</u> be reasonable, taking into account all of the circumstances of the claim, including the claimant's predisability income and regularly scheduled work week. . . .
>
> The following guidelines are for when there is no earnings standard included in the applicable definition of disability.  <u>These guidelines are not intended as inflexible rules: rather, they are meant to assist you in reaching a reasonable decision, based on all of the circumstances of the claim.</u> . . .
>
> \*          \*          \*
>
> •  During the "any occupation period," a claimant will not be considered disabled if the claimant is able to perform, with reasonable continuity, the essential functions of his or her regular occupation or of another reasonable occupation for

---

[1] All references in this Order to the Administrative Record will be cited as "Administrative Record at CL-____."

> which the employee is fitted by education, training, or experience.
>
>       \*    \*    \*
>
> - When we assess whether or not the claimant could perform the duties of an occupation, it is OK that the claimant will need to complete a reasonable period of on the job training with a new employer or in a new occupation, provided that the claimant has the required education, training, and experience to be selected for entry into the occupation. However, if entry into an occupation requires additional training, education, or experience which the claimant can attain, but does not yet possess, the claimant will not be considered able to perform the duties of that occupation.

Administrative Record at CL-00842 - 00843 (emphasis in original).

  B.  Plaintiff's Claim

In 1994, plaintiff was employed by Employer as a marketing representative in New Hampshire. Due to cancer and subsequent depression, plaintiff ceased work in 1994. Thereafter, plaintiff began receiving benefits under the terms of the Policy and received benefits under the Policy over the next ten years. In June 2003, while still receiving benefits, plaintiff relocated from New Hampshire to Oklahoma.

Throughout 2004 and 2005, Integrated Disability Resources, Inc. ("IDR"), the Plan's independent third party administrator, requested and reviewed additional information and records from plaintiff's treating healthcare providers, including Dr. Tim Jones, Dr. Janita Ardis, Linda Shaw, and Laurel Heyman. On June 24, 2004, IDR completed a review, including a consultation with Dr. Jones. In November 2004, IDR completed a clinical review, wherein the clinical consultant determined that the data did not indicate physical functional impairment and requested a review by an in-house medical consultant, Lori Cohen, Ph.D., who specialized in psychiatry. Administrative

Record at CL-00655 - 00657. Dr. Cohen's review included a review of plaintiff's medical records and telephone interviews of plaintiff's treating healthcare providers. At the conclusion of her review, Dr. Cohen determined that the data did not support that plaintiff remains psychiatrically incapacitated from performing full-time occupational duties. Additionally, on April 19, 2005, in connection with a vocational assessment of plaintiff, IDR obtained, through Maine Vocational and Rehabilitation Associates, Inc., a Labor Market Survey ("LMS") to determine plaintiff's employability. The LMS concluded that jobs existed within plaintiff's geographical location at which she could be employed.

On April 21, 2005, IDR completed another review and concluded that plaintiff was able to return to work within her own occupation of insurance sales representative and achieve a gainful wage. IDR, thus, determined that plaintiff no longer met the Policy's definition of disabled. On May 3, 2005, IDR informed plaintiff of its determination that she was no longer eligible for benefits because she no longer met the definition of disabled under the terms of the Policy. *See* Administrative Record at CL-00050.

On August 2, 2005, IDR received plaintiff's appeal from its determination to terminate her benefits. *See* Administrative Record at CL-00539. Included with her appeal was new and additional information from plaintiff's healthcare providers, Dr. Ardis and Linda Shaw. On September 16, 2005, IDR informed plaintiff that there was additional information it needed to review the claim and requested that plaintiff provide said additional information within 45 days. *See* Administrative Record at CL-01109. On October 17, 2005, IDR requested additional information from plaintiff and informed her that her file would be referred for "an Independent Medical Review and Consultation with [her] treating providers, Dr. Ardis and Dr. Holloway." Administrative Record at CL-00463.

4

Dr. Kilburn, who is Board Certified in Psychiatry and Neurology, performed the independent medical review.

On November 7, 2005, Dr. Kilburn consulted with Dr. Ardis. On November 10, 2005, as part of Dr. Kilburn's review, questionnaires were sent to Dr. Ardis and Dr. Holloway. On November 30, 2005, Dr. Kilburn issued her independent medical review and concluded that "[b]ased on the available information, there is not sufficient evidence of record to support the presence of psychiatric impairment so severe as to preclude the claimant's engagement in and maintenance of the tasks of her own occupation or any occupation." Administrative Record at CL-01031. Dr. Kilburn finally received responses from Dr. Ardis and Dr. Holloway on December 7, 2005, and on December 20, 2005, she issued an addendum to her review report. Dr. Kilburn's conclusions remained the same in the addendum. *See* Administrative Record at CL-00986 - 00988.

On February 1, 2006, IDR notified plaintiff that it had completed its review of her appeal and was maintaining the previous termination decision of her claim. *See* Administrative Record at CL-00977 - 00982. On June 12, 2007, plaintiff filed the instant action under the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq., seeking reinstatement of benefits, back benefits plus interest, attorney's fees and costs.

II.  STANDARD OF REVIEW

On April 28, 2008, this Court entered an order determining the applicable standard of review in this case. The Court found that the arbitrary and capricious standard of review, without a

5

reduction in deference, is the appropriate standard of review in this case. *See* April 28, 2008 Order [docket no. 48] at 9.[2]

> When reviewing under the arbitrary and capricious standard, the Administrator's decision need not be the only logical one nor even the best one. It need only be sufficiently supported by facts within [his] knowledge to counter a claim that it was arbitrary or capricious. The decision will be upheld unless it is not grounded on *any* reasonable basis. The reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness – even if on the low end.

*Nance v. Sun Life Assurance Co. of Canada*, 294 F.3d 1263, 1269 (10th Cir. 2002) (quoting *Kimber v. Thiokol Corp.*, 196 F.3d 1092, 1098) (10th Cir. 1999)) (emphasis in original).

### III. DISCUSSION

Having carefully reviewed the administrative record, the Court finds defendant's decision to terminate plaintiff's benefits was not arbitrary and capricious. Specifically, the Court finds that the administrative record contains sufficient facts to show that defendant's decision falls somewhere on the continuum of reasonableness.

Initially, the Court finds that IDR's investigation of plaintiff's claim was certainly reasonable. IDR undertook numerous investigative measures to determine plaintiff's continued eligibility for disability benefits. Specifically, IDR: (1) requested and reviewed plaintiff's relevant medical records, including records submitted from plaintiff's multiple treating healthcare providers; (2) conducted clinical reviews and assessments, including on-site physician reviews; (3) requested

---

[2]In her supplemental brief, plaintiff indicates that the recent United States Supreme Court opinion in *Metro. Life Ins. Co. v. Glenn*, 128 S. Ct. 2343 (2008), is applicable to the instant case. The *Glenn* case, however, involved an administrator's conflict of interest; the instant case does not involve an administrator who is operating under a conflict of interest. The Court, therefore, finds that the *Glenn* case is inapplicable to the instant action.

6

and conducted an outside independent medical review by Dr. Kilburn; (4) requested a LMS, and (5) conducted telephone interviews of, and sent questionnaires to, plaintiff's treating healthcare providers.

Additionally, in her brief, plaintiff challenges certain items, such as file review psychiatric/psychological opinions, within the administrative record and asserts that it is improper to rely on these items in making any determination as to whether plaintiff is still disabled. Having reviewed the administrative record, the Court finds that it was reasonable for IDR to rely upon these items and to give these items the weight that it did. Further, the Court finds that IDR's decision to terminate plaintiff's benefits was not arbitrary and capricious because it relied on the subject items.

Further, in her brief, plaintiff asserts that defendant is judicially estopped to deny plaintiff is disabled because in 1996, defendant agreed that plaintiff was entitled to, and helped plaintiff receive, Social Security benefits. However, at the time defendant assisted plaintiff in obtaining Social Security benefits, plaintiff had been determined to be disabled and was receiving benefits under the Policy. It was not until ten years later that defendant determined that plaintiff was no longer disabled. In light of the above, the Court finds that defendant should not be judicially estopped to deny plaintiff is disabled.

Finally, having reviewed the administrative record, the Court finds that while there is evidence within the administrative record that would support plaintiff's position that she is still disabled under the Policy, there is sufficient reasonable reliable evidence within the administrative record that supports defendant's decision to terminate plaintiff's benefits. Specifically, the signed summary of the telephone interview of Dr. Ardis supports defendant's decision. The summary states, in part:

> At the onset of treatment, Ms. Rodden informed you that she felt a lot better than she had in the past and you observed that Ms. Rodden appears, overall, still more improved over the last six months.
>
>       \*    \*    \*
>
> . . . You opined that Ms. Rodden's activities of daily life are not impaired. You stated, "I don't think she's incapacitated."
>
> When asked why Ms. Rodden is not gainfully employed, you stated that you confronted Ms. Rodden about this in the last session and that Ms. Rodden stated that she believes she is disabled because she doesn't know what she can do. Ms. Rodden stated that she is not trained for anything. You believe that Ms. Rodden may have become very comfortable with her lifestyle since she has not been working since 1994.

Administrative Record at CL-00638 - 00639. The signed summary of the telephone interview of Linda Shaw also supports defendant's decision. That summary states, in part:

> When asked how Ms. Rodden occupies her time and whether or not there is any evidence of impairment in non-occupational functioning, you stated that Ms. Rodden is involved in a high level of activity. She attends to all household activities including cleaning, errands and making plans. You have wondering if Ms. Rodden may suffer from some features of an Obsessive-Compulsive Disorder as she has to keep things very exact. Her day planning seems to be "a full-time job in itself." She reportedly resides in a 2,000-3,000 square foot home and occasionally sees her son in Colorado. She also is helping her mother in New Hampshire.
>
> When asked if there are any signs of impaired functioning secondary to a psychiatric illness, you stated that Ms. Rodden is frightened that if she has to go to work on a daily schedule, her anxiety would increase and overwhelm her. She reports "occasional panic attacks." When asked how often these occur, you stated, "Not often. They're under control." Ms. Rodden also states that she is occasionally depressed, though you do not know how long this lasts or how this is manifested. You have not observed Ms. Rodden to be severely clinically depressed.
>
> Though you believe that Ms. Rodden has never worked through some early childhood issues and has a propensity to become anxious, you

> stated that there has been no sign that Ms. Rodden is "the least bit disabled in daily life." Rather, she is anxious about the prospect of becoming anxious if she has to return to work.
>
> I spoke with you about the possibility that Ms. Rodden could work with her psychotherapist and psychiatrist while returning to work if symptoms of anxiety should surface, and you agreed. You concluded by stating that it appears that Ms. Rodden is "very comfortable working at home."

Administrative Record at CL-00641 - 00642.

Additionally, Dr. Cohen's review supports defendant's decision to terminate benefits. In that review, Dr. Cohen states as follows:

> The information provided by [plaintiff's] treatment providers indicates that Ms. Rodden has not demonstrated a severe depression since working with them in treatment. In addition, she is demonstrating an extremely active lifestyle, caring for her home, her husband, visiting with her son, and helping to care for her mother, who lives in New Hampshire. Ms. Shaw opines that there is no sign that any of Ms. Rodden's activities of daily living are impaired due to psychiatric symptoms. Dr. Ardis agreed that activities of life are unimpaired, and Dr. Ardis opined that Ms. Rodden is not incapacitated occupationally.
>
> Both Ms. Shaw and Dr. Ardis agree that while Ms. Rodden does not demonstrate impairing psychiatric symptoms, she states that she is afraid that she will become anxious if she has to follow a work schedule. However, Ms. Shaw also described Ms. Rodden's current life as similar to a full-time job in terms of her level of activity.
>
> At this juncture, the data does not support that Ms. Rodden remains psychiatrically incapacitated from performing full-time occupational duties. While she may suffer from trepidation about becoming anxious were she to return to full-time employment, Ms. Shaw agrees that Ms. Rodden could attempt to work and continue to treat psychiatrically such that if symptoms were to surface, the treatment would be available to her to attend to her psychiatric needs.

Administrative Record at CL-00630. Dr. Kilburn's independent medical review further supports a finding that plaintiff is no longer disabled under the Policy. In her review, Dr. Kilburn states:

9

> Based on the available information, there is not sufficient evidence of record to support the presence of psychiatric impairment so severe as to preclude the claimant's engagement in and maintenance of the tasks of her own occupation or any occupation. Mental status exam findings do not show severe deficits in cognition, thought process, or thought content. The claimant remains engaged in a wide variety of activities, including exercising, travel, maintaining her home, driving, and hosting guests. She is stable on medication. The length of time on claim and the claimant's protracted absence from the workplace may be barriers to the claimant's successful return to her own occupation.
>
> \* \* \*
>
> . . . the medical evidence does not support occupational impairment as of May 2005. Documented mental status exam findings are not consistent with significant deficits. The claimant has been, and continues to be, involved in a variety of activities as described; these are consistent with intact cognitive and interpersonal abilities required by an insurance marketing representative. The claimant is stable on medication.
>
> \* \* \*
>
> . . . Based on the available documentation, there is no evidence of decompensation or an overall decline in the claimant's psychiatric status between January 2005 and August 2005, for the reasons cited above, including mental status exam findings, stability on medication, and the claimant's continued engagement in a variety of activities. The claimant self-reported deterioration in May 2005, related to losing her disability benefits. However, the available records do not document an acute or sustained increase in the claimant's findings, change in her level of function or change in the treatment plan.

Administrative Record at CL-01031 - 01032. Additionally, in her addendum to her original report, Dr. Kilburn states:

> The additional documentation from Dr. Holloway confirms the presence of longstanding, chronic depression. As noted in the previous review, with regard to the dates in question, 05-2005 to the present, the claimant's mental status exam findings have been stable and without acute change or decompensation. There is no evidence of impairment in intellect, thought content, or thought processes. The

10

additional documentation submitted by Dr. Ardis and Dr. Holloway does not contain specific mental status exam findings. There has been no change in the claimant's medication regimen from 3/2/05 to the present. Available records indicate that the claimant has continued to engage in a variety of activities, including driving, maintaining her home, exercising, visiting her son, and hosting a female friend. The additional documentation from Dr. Ardis and Dr. Holloway, stating that the claimant is involved in minimal to no regular activity, appears to be based primarily on the claimant's self-report and is not consistent with documentation provided in the medical records, reviewed previously. Dr. Ardis noted the claimant believes that she cannot work; in their additional documentation, both providers note that the claimant becomes distraught and anxious when regular activities, work, and/or engagement in rehabilitation is discussed. As previously noted, the claimant's perception of herself as unable to work has likely been reinforced by the length of time she has been on claim, and the absence of clearly defined return to work expectations and efforts.

Administrative Record at CL-00987.

Finally, the LMS supports defendant's decision to terminate plaintiff's benefits. The LMS states:

> After completing research for this LMS, this Vocational Rehabilitation Counselor (VRC) found that out of 10 Insurance Companies contacted, all 10 could accommodate a 10-year absence from the workforce. 5 companies could meet the gainful wage of $15.91 per hour and 5 companies could not meet the claimant's gainful wage. This VRC found that most insurance companies require one to be licensed by state regulations and most companies will sponsor a qualified applicant to take the exam which is $150.00 fee. Some smaller companies would not sponsor an applicant for licensure and an applicant would be responsible for this on their own.
>
> Many of the companies welcomed the claimant to fill out applications and stated that 15-years of experience within the Insurance Sales Industry would qualify one for employment within their company. Therefore, it is in this VRC's opinion that jobs do exist within the claimant's geographical location and a 10-year gap in work history would not affect employment opportunities that are available.

Administrative Record at CL-00586.[3]

## IV. CONCLUSION

Accordingly, for the reasons set forth above, the Court finds that defendant's decision to terminate plaintiff's benefits was not arbitrary and capricious and that defendant, therefore, is entitled to judgment in its favor. The Court, therefore, ORDERS that judgment be entered in favor of defendant.

**IT IS SO ORDERED this 11th day of February, 2010.**

VICKI MILES-LaGRANGE
CHIEF UNITED STATES DISTRICT JUDGE

---

[3]Plaintiff asserts that every job identified as "gainful" in the LMS requires her to have an insurance sales license in Oklahoma. She further asserts that because to get a license she would have to take the state licensing exam, which costs $150.00 and is 150 questions, she would need additional education and training to get an Oklahoma state license. Plaintiff, therefore, contends that she does not qualify for these jobs because under the "Reasonable Continuity and Reasonable Earnings Guidelines," if entry into an occupation requires additional training or education which the claimant can attain but does not yet possess, the claimant will not be considered able to perform the duties of that occupation. The Court finds that plaintiff's argument is without merit. The LMS specifically finds that most companies will sponsor a qualified applicant to take the exam. Additionally, the "Reasonable Continuity and Reasonable Earnings Guidelines" are "not intended as inflexible rules." Administrative Record at CL-00842. The Court, therefore, finds that it is reasonable to conclude that plaintiff is qualified under the Policy for the jobs identified in the LMS.